Filed 6/3/21  P. v. Gomez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071806 |
| v. | (Super.Ct.No. RIF1801173) |
| JUAN BERNARDO GOMEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed.

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorney Generals, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Juan Bernardo Gomez guilty of 19 counts of rape. (Pen. Code, § 261, subd. (a)(2).)[1] The jury found true the allegation that the rapes were committed against more than one victim. (§ 667.61, subd. (e)(4).) As to Counts 1 through 8, the jury found true the allegations that the rapes were committed against a minor who was 14 years of age or older. (§ 264, subd. (c)(2).) The trial court sentenced defendant to prison for eight consecutive indeterminate terms of 25 years to life (Counts 1 through 8) and 11 consecutive indeterminate terms of 15 years to life (Counts 10 through 20), which amounts to a sentence of 365 years to life.

Defendant raises five issues on appeal. First, defendant contends substantial evidence does not support the finding of duress for Counts 10 through 20. Second, defendant asserts the trial court erred by giving the generic testimony unanimity instruction (CALCRIM No. 3501) for Counts 10 through 20. Third, defendant asserts the trial court erred by refusing his pinpoint instruction concerning duress. Fourth, defendant contends the trial court erred by not sua sponte instructing the jury on two allegedly lesser included offenses. Fifth, defendant asks this court to review sealed school records to determine if they contain any discoverable information. We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL AND PROCEDURAL HISTORY

A.     COUNTS 10 THROUGH 20:  SISTER

M.R. (Sister) and defendant are half-siblings; they share the same mother. Defendant is approximately 10 years older than Sister. Sister lived on a ranch in Mexico. In November 2003, a few days before Sister's 20th birthday, she came to live in the United States for the first time. Sister moved into defendant's two-bedroom apartment. Other people who lived in the apartment were defendant, defendant's wife, defendant's children, and two of Sister's older brothers (Javier and Huber). A younger brother, Manuel, came to live in the apartment after Sister arrived. When Sister arrived in America, all of Sister's family in America lived with defendant.

Sister relied more on defendant than on her other relatives because defendant had been in America longer than the others so she felt he could offer the best advice. Sister began working with defendant making guitar amplifiers, and defendant taught her about the job. Defendant was self-employed and paid Sister for her work.

A few months after Sister arrived, defendant showed Sister pornographic movies. Sister did not want to watch the movies and found them disgusting. When Sister watched the movies, defendant kissed and touched Sister. Defendant told Sister that it was normal in America for siblings to engage in sexual activity with one another. Defendant told Sister to "unblock [her] mind and to let [her]self go with the flow." Over a period of months, defendant repeatedly told Sister it was normal in America for siblings to engage in sexual activity. Defendant "eventually manipulated [Sister] into believing it was true," although she remained uncomfortable with the idea.

3

Sister felt she had to continue living with defendant because otherwise she would be alone, and defendant convinced her that she "wasn't capable . . . to be out on [her] own." Sister believed defendant because she did not know how to drive and did not know "how life works" in the United States. Defendant told Sister that if she went to the police then she could be questioned about her citizenship and her lack of identification. Sister feared being deported.

Over the course of three to six months, the contact between defendant and Sister progressed to Sister orally copulating defendant and then to vaginal intercourse. The first time Sister engaged in intercourse with defendant she did so because she was scared. The intercourse occurred approximately once per week while living in the apartment and typically occurred in the bathroom or defendant's bedroom. The intercourse typically occurred when defendant's wife (Wife) dropped off or picked up the children from school. Defendant instigated the intercourse by asking Sister "to help him out." The intercourse typically involved Sister orally copulating defendant followed by vaginal intercourse, in which defendant was behind Sister. Sister remained still during the intercourse. Sister believed defendant "wanted a person that he could use whenever he felt like it."

Defendant decided that Sister would move into his bedroom. Defendant was "a very jealous person and he didn't want [Sister] to be around any other people that were male;" defendant wanted Sister to himself. Sister told defendant that she would rather sleep in the living room, but defendant told her that she would "be better off in the

4

bedroom" due to the other male siblings in the house. Sister moved into defendant's bedroom.

Sister never wanted to engage in intercourse with defendant because he is her half-brother. When Sister rejected defendant's sexual advances, defendant would say, "[W]hy not? Why don't you want it? You have to help me." Defendant would also be in a bad mood and yell about the home being dirty. Defendant never used physical force against Sister, never threatened to physically harm her, and never threatened to punish her. Sister continued engaging in intercourse with defendant over the years because she "didn't have anywhere to go," she "was afraid to get out into the world," and she "thought [she] had no way out."

Defendant tracked Sister's menstrual cycle. Nevertheless, on two occasions, defendant impregnated Sister. Defendant bought pregnancy tests for Sister on those two occasions. Sister was scared to go to a medical clinic for an exam because she had never been to a clinic for an obstetric exam and defendant told her that people at the clinic would ask her questions. Defendant gave Sister pills that terminated the two pregnancies.

When Sister told defendant she wanted to leave to see their mother, defendant told Sister that she would be unable to financially assist their mother if she left. Sister's brothers, Javier and Huber, moved into their own residence. Sister did not move with them because she was scared. Sister was scared because she "didn't know what to do." Sister did not tell her relatives about the rapes because she thought they would not believe her or they would blame Sister for provoking defendant.

5

In 2009, defendant's family, Sister, and Manuel moved to a five-bedroom house in Corona. At the house in Corona, Sister shared a bedroom with N.G., who is defendant's daughter. Defendant's guitar amplifier business moved into the garage. Sister found a second job working in a bakery. Her typical shift at the bakery was eight hours per day, six days per week. Sister worked at the bakery for approximately two years.

While in the house, intercourse between defendant and Sister occurred approximately once per month. Also while in the house, when Sister rejected defendant's sexual advances, defendant "would hit things," such as a table, which scared Sister. Sister said that defendant "wanted to control [her]." She explained, "[H]e wanted to know where I was going, who I was with, and what I was doing, who I was with. He wanted to know—find out whether I had a boyfriend. And when I would go out, he would always get upset."

After "a number of years," Manuel moved out of the Corona house. Sister said she could have moved-out of the Corona house, but she chose to continue living with defendant because defendant needed help making the mortgage payments. Sister explained that she had developed skills with the guitar amplifiers, so she felt she needed to stay in order to aid defendant in his business, which in turn would help pay the bills. Sister and defendant ceased engaging in intercourse in approximately 2014. Sister moved out of defendant's home in 2015. Sister never wanted to engage in sexual activity with defendant. She always found it uncomfortable and disgusting.

6

Counts 10 through 20 pertained to Sister and each count concerned a different calendar year from 2004 through 2014.

B.  COUNTS 1 THROUGH 8:  DAUGHTER

N.G. (Daughter) is defendant's daughter.  Daughter was born in August 1997. Defendant was born in May 1972.  Defendant told Daughter that intercourse is a form of exercise.  When Daughter was 14 years old, she and defendant went to a house that had been sold in order to clean it for the new owners.  While in the vacant house, defendant told Daughter that she could lose weight by engaging in intercourse.  Defendant told Daughter "it was going to hurt, but I'll try to be as gentle as possible."  Defendant directed Daughter to remove her jeans and underwear, which she did.  Defendant pulled down his own jeans and underwear.  Defendant engaged in vaginal intercourse with Daughter.  During the intercourse, Daughter was still and felt as if she could not move.

Defendant engaged in intercourse with Daughter three to four times per week from the time she was 14 years old until she was 18 years old.  Defendant told Daughter to "think of the family," which Daughter understood to mean that if she spoke to people about their sexual intercourse then the family would be separated.  The idea of the family being separated scared Daughter.  In November 2015, Daughter told Wife, who is Daughter's mother, that defendant had been sexually abusing her.  Wife then told Daughter's oldest brother about the abuse, and they brought defendant into the room. Defendant denied the allegations and then went back to working downstairs.

In January 2016, after Daughter and defendant engaged in intercourse and defendant ejaculated inside of her, Daughter wiped her vaginal area with a piece of

7

toilet paper and then placed it in a plastic bag. Daughter stored the toilet paper, in the bag, in a drawer in her room. In April 2016, Daughter told her aunt Irene about defendant's sexual abuse. Irene contacted the police. The toilet paper in the plastic bag was given to the police. DNA testing matched the sperm on the toilet paper to defendant.

## DISCUSSION

### A.    SUBSTANTIAL EVIDENCE

Defendant contends substantial evidence does not support the finding of duress in relation to Sister.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Rape is an act of sexual intercourse with a person who is not the perpetrator's spouse where the intercourse "is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another." (§ 261, subd. (a)(2).) "As used in this section, 'duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a

8

reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b).)

" 'The very nature of duress is psychological coercion. A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent. We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults.' " (*People v. Veale* (2008) 160 Cal.App.4th 40, 48.)

We begin with the rapes that occurred in the apartment. Sister testified that defendant is "the type of person that works you psychologically" and that defendant "wanted to control [Sister]." Defendant isolated Sister while they lived in the apartment by having her sleep in his bedroom and work as his employee; the two often worked with only one another. Defendant isolated Sister from any law enforcement assistance by implying that she would risk deportation if she sought help, and Sister feared deportation. Defendant isolated Sister from medical care by scaring her regarding questions that would be asked of her at a clinic. Defendant further isolated Sister by convincing her "that the outside world was different, that people outside were not good people." Ultimately, defendant convinced Sister that she was not capable of surviving

9

on her own. The first time Sister engaged in intercourse with defendant, she did so because she was scared. Sister explained, "I was afraid of the world because I didn't have too many people around me. I—I'm by myself."

The foregoing evidence reflects that defendant used psychological coercion to isolate Sister from any form of help (e.g., police or medical) and then convince her that she could not survive alone, which effectively meant, in Sister's mind, that she had to stay with defendant because otherwise she would be alone and suffer harm. Sister would suffer harm because, as defendant told her, "people outside were not good people," which implies they will harm Sister. If Sister suffered harm, then no one would assist her because Sister cannot get medical care or go to the police without some further risk. When defendant's various statements are aggregated, they establish that defendant made an implied threat of danger.

The implied threat of danger must be sufficient to coerce a reasonable person of ordinary susceptibilities. (§ 261, subd. (b).) A reasonable person who moves to a new country, where she does not know anyone other than the family in the apartment in which she is residing, would rely heavily upon that family. If the relative with the most experience in the new country warned the reasonable person to not go to the police because the reasonable person could face citizenship questions, it would be reasonable for that person to fear contacting the police. If the relative with the most experience in the new country then advised that there are bad people in the outside world, that could also appear to be good advice because the reasonable person simply has no basis by which to gauge if the information is wrong and would want to err on the side of caution

10

given the inability to seek police and medical assistance. Due to the limited ability to contact people who could provide assistance, combined with the threat of bad people in the outside world, a reasonable person could feel helpless and believe that submitting to defendant's demands is the only way to remain safe. In sum, there is substantial evidence that defendant made an implied threat of danger sufficient to cause a reasonable person to acquiesce.

We now examine the rapes that occurred in the house in Corona. By 2009, when the family moved to Corona, Sister had been in America for more than five years and, at some point in Corona, she obtained a second job at a bakery. However, Sister was still scared and felt cornered. In Corona, defendant began hitting objects when Sister refused his sexual advances, which scared Sister. Sister testified that defendant tried to control her by asking where she was going and who she was meeting and becoming upset when she left the house. When Sister had to have contact with the police for the instant case, she remained hesitant to speak with the police. Thus, while Sister had a bit more independence in Corona, defendant's psychological manipulation of Sister persisted. From the foregoing evidence, a trier of fact could reasonably find that defendant's implied threat of danger continued through the rapes in Corona.

We now examine whether the ongoing implied threat of danger would be sufficient to coerce a reasonable person of ordinary susceptibilities. (§ 261, subd. (b).) By 2009, the reasonable person would have been raped on a weekly basis for approximately five years. Under those circumstances, a reasonable person could rationally conclude that there was no one to help her, so, in light of the implied threat of

11

more danger in the outside world, acquiescing to defendant's demands was the only choice.

In sum, there is substantial evidence that defendant made an implied threat of danger sufficient to cause a reasonable person to acquiesce. Accordingly, we conclude substantial evidence supports the jury's finding of duress.

For multiple reasons, defendant asserts it is improper to find duress based upon defendant's warnings regarding the police. The first reason given by defendant is that defendant did not tell Sister to avoid the police—he merely warned her that they would ask her questions. The record reflects the following exchange during the direct examination of Sister:

"[Prosecutor]: Did he ever tell you that you could not tell the police?

"[Sister]: Not directly.

"[Prosecutor]: Okay. What do you mean by that?

"[Sister]: My legal status.

"[Prosecutor]: Could you explain that for us[?]

"[Sister]: That for us it was very difficult to go and show up at a police station. I was afraid."

"[Prosecutor]: What made you afraid to go to the police?

"[Sister]: I was afraid to be arrested for me to leave."

"[Prosecutor]: What made you afraid—what made you think the police were going to arrest you?

"[Sister]: Because we didn't have IDs from here."

The foregoing exchange indicates that the information defendant conveyed to Sister about the police caused her to fear being deported if she contacted the police. As the direct examination continued, the prosecutor asked, "Did [defendant] tell you that if you went to the police, you would be arrested?" Sister responded, "He would say the first thing they're going to ask you for is an ID." The prosecutor asked, "Did it make you afraid when he would tell you that?" Sister replied, "Yes. I wanted to solve the problem, but I didn't know how to solve it." The foregoing evidence confirms that defendant's statements to Sister about interacting with the police caused her to fear that she would be deported if she had contact with the police.

On cross-examination of Sister the following exchange occurred:

"[Defense counsel]: When you came to the United States, was [defendant] the only person that said, hey, you know what? Be careful around the police or something may happen such as deportation, or were other people telling you that?

"[Sister]: He would say to me to be careful that here it wasn't easy to drive and life wasn't easy here.

"[Defense counsel]: I'm not sure how that answered my question. It sounds like you had a fear of going to the police department, right?

"[Sister]: My fear was to be arrested.

"[Defense counsel]: Okay. Was the fear that you would be escorted out of the country?

"[Sister]: Yes.

"[Defense counsel]: And when [defendant] would tell you, you know, if you go to the police, potentially something could happen, you could get arrested and you could be deported, did you take that as him giving you, like, some advice, or did you take that as a threat?

"[Sister]: I did not take it as a threat, but I was basing it on him because he had been in this country for longer."

On cross-examination, Sister again confirmed that defendant's statements about interacting with the police caused her to fear being deported if she contacted the police. Accordingly, we are not persuaded that defendant advised Sister that she would be merely questioned by police if she were to contact them.

The second reason given by defendant for why we should not rely upon evidence of warnings about the police is that Sister's documented or undocumented immigration status in the country was not in evidence because the prosecutor sought to have that evidence excluded. While Sister's immigration status in America was not expressly stated for the record, it was clearly implied, in that Sister repeatedly said she feared being deported. Sister's fear of deportation indicated that she lacked necessary immigration documents.

A third reason given by defendant is that there is no timeline for when defendant spoke to Sister about the police. Sister said that the first time she engaged in intercourse with defendant, she did so because she was scared. Sister said she had "sex with [defendant] in [the apartment] all of those times" because she "thought [she] had no way out" and "felt cornered." One can reasonably infer that part of the reason Sister felt

14

scared upon the initial sexual intercourse was that she felt trapped and unable to seek assistance from the police due to defendant's comments. So, while defendant is correct that a timeline for defendant's comments about the police was not expressly set forth in the record, one can reasonably infer from Sister's testimony regarding her fear that the information about the police was communicated before she engaged in sexual intercourse with defendant.

A fourth reason given by defendant is that none of defendant's comments about the police preceded a particular sexual incident, so if defendant made a threat regarding the police then it was not made to coerce Sister into sexual activity. This is not a case in which an explicit threat of danger was made immediately prior to any particular sexual incident. Rather, defendant created an ongoing environment of fear by convincing Sister that she could not survive on her own and then isolating her. Defendant effectively made Sister completely dependent upon him so that she had to acquiesce to his sexual demands. That type of control and isolation combined with an implied threat of harm from "outside people" and Sister's fear reflect psychological coercion that amounts to duress. (See *People v. Senior* (1992) 3 Cal.App.4th 765, 775 ["duress involves psychological coercion"]; see also *People v. Cardenas* (1994) 21 Cal.App.4th 927, 938-939 [duress exists when victims were dependent on the defendant due to the control he exerted over them].) In sum, substantial evidence supports defendant's rape convictions involving Sister.

15

B.      UNANIMITY INSTRUCTION

1.      *PROCEDURAL HISTORY*

As explained *ante*, Counts 10 through 20 pertained to Sister and each count concerned a different calendar year from 2004 through 2014.  On a jury instruction request form, which lists numerous different jury instructions, defendant's trial counsel asked the trial court to instruct the jury with CALCRIM No. 3501, which is the generic testimony unanimity instruction.  Defense counsel did not request CALCRIM No. 3500, which is the "regular" unanimity instruction.

During a discussion of jury instructions in the trial court, the court said, "3501 was the unanimity instruction.  [¶]  [Defense counsel], were you okay with the language in that one?"  Defense counsel responded, "I'm just starting to read it right now, your Honor.  [¶]  . . .  [¶] . . . I'm fine with it."

The trial court instructed the jury with CALCRIM No. 3501, which provides, "The defendant is charged with rape of [Daughter] in Counts 1—8 sometime during the period of August 18, 2011 through and including August 17, 2015.  The defendant is charged with rape of [Sister] in Counts 10—20 sometime during the period of January 1, 2004 through and including December 31, 2014.  [¶]  The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless:  [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed; [¶] OR [¶] 2. You all agree that the People have proved that

16

the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

 2. *ANALYSIS*

Defendant contends the trial court erred by giving the jury the generic testimony unanimity instruction (CALCRIM No. 3501) for Counts 10 through 20, involving Sister, because that instruction should only be given when the victim is a child. The People assert defendant invited the alleged error or forfeited the issue. We choose to address the merits of the contention. (See generally *People v. Souza* (2012) 54 Cal.4th 90, 114 [invited error requires counsel to have expressed a tactical purpose for the error].)

The use of a generic testimony unanimity instruction was approved in *People v. Jones* (1990) 51 Cal.3d 294, 300-302, 305, (*Jones*) which concerned the molestation of a child under 11 years old. The Supreme Court explained that "[c]hild molestation cases frequently involve difficult, even paradoxical, proof problems. A young victim . . . assertedly molested over a substantial period by a parent or other adult residing in his home, may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents. (Indeed, even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance." (*Id.* at p. 305.)

In such cases, the Supreme Court approved the use of the unanimity instruction for generic testimony. (*Jones*, *supra*, 51 Cal.3d 294 at p. 321.) The court reasoned that such an instruction is permissible "because credibility is usually the 'true issue' in these

cases, 'the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it. In either event, a defendant will have his unanimous jury verdict [citation] and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act.' " (*Id.* at p. 322.)

*People v. Matute* (2002) 103 Cal.App.4th 1437, 1447, involved a victim who was 15 and 16 years old at the time of the offenses. Despite the difference in ages between the victims in *Jones* and *Matute*, the *Matute* court relied upon *Jones* in rejecting the defendant's assertion that his due process rights were violated by the use of generic victim testimony. The *Matute* court wrote, "Concededly, the present case involves crimes committed against a victim when she was 15 and 16 years old, and thus does not fall squarely within the factual parameters of the *Jones* case, which involved molestation of children under the age of 14. However, we conclude that the reasoning and conclusions reached by the court in *Jones* are fully applicable under the circumstances present here. . . . The fact [that the victim] was 15 and 16 at the time of the crimes involved here makes little difference with regard to her inability to differentiate among the continual rapes perpetrated by defendant." (*Id.* at p. 1447.)

We agree with the reasoning of *Matute*. Sister was raped for a 10-year period starting when she was 20 years old. Defendant's raping of Sister tended to occur in the same locations: in the bathroom and defendant's bedroom in the apartment, and in Sister's bedroom in Corona. The rapes also tended to involve the same activity—Sister

18

orally copulating defendant and then vaginal intercourse in which defendant was behind Sister.  The rapes typically occurred at the same time of day:  when Wife dropped off or picked up the children from school while living in the apartment, and at night or when people were away from home in Corona.  The rapes occurred weekly in the apartment (2004 to 2009), and then monthly in Corona (2009 to 2014).  The trial did not take place until 2018.

Given the 10-year time span of the rapes, that the rapes occurred on a weekly basis for approximately five years and then a monthly basis for another five years, that the rapes typically occurred in the same locations inside the two homes, that the rapes tended to involve the same activities, and that defendant resided in both homes with Sister, it was understandable that Sister, even though she was an adult, had difficulty differentiating the incidents by time, place, or circumstance.  Given the evidence, the trial court could properly give the jury the generic testimony unanimity instruction. (See *Jones*, *supra*, 51 Cal.3d at p. 1445 ["even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance"].)

Defendant contends we should not extend *Jones* and *Matute* to rape cases involving adults because a lack of consent has to be shown as to each incident of rape, which is a fact specific analysis that cannot be performed with generic testimony. Defendant asserts the jury could have reasonably disagreed regarding which statement or act by defendant caused Sister's duress.  Defendant points to the different statements and acts relied upon by the prosecutor—defendant's statements about Sister's inability

19

to financially support her mother, defendant's statements about the difficulty Sister would experience if she were alone, defendant being upset when Sister rejected his sexual advances, and defendant's statements about Sister being asked for identification if she went to the police. Defendant asserts the jurors could have found duress based upon different statements or acts, so this is not a case in which the jury simply had to decide whether to accept or reject Sister's version of the events.

"In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Jones*, *supra*, 51 Cal.3d at pp. 321-322.)

As explained *ante*, *Jones* is a child molestation case, so, in that case, "the acts" did not involve an issue of consent. Because the instant case is a rape case, it involves not only acts pertaining to intercourse but also acts pertaining to consent. The testimony about the statements and acts that caused Sister duress were nearly as generic as the testimony about the sexual incidents. For example:

"[Defense counsel]: Now, the question is why did you have sex with your brother in [the apartment] all of those times then?

"[Sister]: I thought I had no way out."

20

"[Defense counsel]: So you had sex because there was no way out. Did you feel trapped financially?

"[Sister]: If I would have felt financially trapped, I would have said so from the beginning.

"[Defense counsel]: So I don't understand why you felt no way out. Why did you feel that way that you had no way out?

"[Sister]: What I want you to understand that ours is two completely different cultures. I was raised in a completely different manner than what it is here. And what I'm understanding by your questions is that you are saying that I did this for some type of interest or gain, and I did not.

"[Defense counsel]: But you said you did it because you had no way out. So was there something your brother did to you that gave you no way out?

"[Sister]: He would say that the outside world was different, that people outside were not good people.

"[Defense counsel]: So correct me if I'm wrong. So you had sex with him because he said the outside world was different?"

"[Sister]: I didn't do it because of that.

"[Defense counsel]: I'm asking you why you did it.

"[Sister]: Because I felt . . . [¶] . . . [¶] . . . cornered."

"[Defense counsel]: What did your brother [defendant] do you to you [*sic*] to make you feel cornered?

21

"[Sister]: In reality he thought that I wasn't capable to be able to be out on my own.

"[Defense counsel]: Okay. So he had that thought that you weren't capable to be out on your own and somehow did that concern you?

"[Sister]: He made me think that I truly wasn't capable.

"[Defense counsel]: Okay. So he convinced you to believe that you couldn't make it on your own in the outside world?

"[Sister]: He's the type of person that works you psychologically and he makes you feel that way."

In the prosecutor's and defense counsel's examinations of Sister, they both repeatedly tried to coax Sister into explaining why she felt trapped in defendant's homes. The trial attorneys asked a variety of questions about financial pressure, concerns about her mother, fear of violence, and fear of deportation. None of those questions resulted in testimony about a specific threat immediately prior to a rape. Rather, the result was a more global or aggregated picture of Sister fearing essentially everyone to the point where she was effectively helpless, e.g., Sister's testimony, "I was afraid of the world" and that she "felt cornered." In her testimony, Sister was fairly clear about at least one thing—that it was not a single threat immediately prior to intercourse that caused her to acquiesce. Despite the attorneys' repeated questions about what specifically caused Sister to feel trapped, she consistently rejected the notion that it was one specific threat and explained that defendant "works you psychologically."

22

Accordingly, this is not a case where jurors might disagree as to the particular statement or act that caused Sister duress. Given the evidence in the case, the jury would have either accepted or rejected Sister's testimony that defendant psychologically manipulated her into believing that she was helpless. Therefore, we are not persuaded by defendant's assertion that some jurors would have found duress based upon one threat while other jurors may have found duress due to a different threat.

### C.    PINPOINT INSTRUCTION

#### 1.    *PROCEDURAL HISTORY*

Defendant requested the jury be given a pinpoint instruction which read, "Duress does not mean a direct or implied threat of hardship." The prosecutor objected arguing that the jury would be instructed on the definition of duress, so it did not need to be instructed on what is excluded from the definition of duress. The trial court asked defense counsel, "Why do I need to tell them what duress is not?" Defense counsel responded by saying that, in his closing argument to the jury, he would assert that hardship is not part of duress and "if [you] don't believe what I'm saying, send a note to the judge." The trial court said it was fine with that being part of defense counsel's argument, but it would not give the pinpoint instruction.

The trial court gave the jury the following instruction regarding duress: "Duress means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all

23

the circumstances, including the woman's age and her relationship to the defendant." (CALCRIM No. 1000.)

In closing argument, defense counsel argued, "Duress does not mean [a] direct or implied threat of hardship. Read that. That is not included in the instruction. That is the state of the law though. If you want to double, triple check that, send a note to the judge and that's the answer you're going to get back I would imagine because that's the law, that duress does not mean direct or implied threat of hardship because it would be included within the definition of duress."

2.    *ANALYSIS*

a.    Denial of the Pinpoint Instruction

Defendant contends the trial court erred by not instructing the jury that hardship is excluded from the definition of duress because the proposed instruction was accurate and not duplicative.

"Pinpoint instructions ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1173-1174.) "The trial court may properly refuse an instruction highlighting a defense theory if it is 'duplicative or potentially confusing.' [Citation.] '[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused.' " (*Id.* at p. 1174.) We apply the de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The trial court instructed the jury on the definition of duress, which includes a list of what *does* qualify as duress, e.g., an implied threat of danger. By defining what

24

*does* qualify as duress, the trial court necessarily explained that anything not on that list *does not* qualify as duress. A further definition of duress, which explicitly excludes hardship would have been duplicative. (See *People v. Jo*, *supra*, 15 Cal.App.5th at p. 1174 [the trial court instructed jury on malice, so a pinpoint instruction on "ways of disproving malice would have been confusing, duplicative"].) Accordingly, we conclude the trial court did not err.

### b.    Due Process

Defendant contends the trial court's refusal to give the proposed pinpoint instruction violated his federal right of due process by denying him the right to have the jury adequately instructed on his defense theory. Defendant notes that the trial court instructed the jury that if there were a conflict between the instructions and counsel's argument, then the jury had to follow the instructions. Defendant asserts that because the jury was not instructed on hardship being excluded from the definition of duress, it would have disregarded defense counsel's argument as conflicting with the duress instruction.

There was not a conflict between the instruction and counsel's argument. In the duress instruction, there is a list what qualifies as duress: "a direct or implied threat of force, violence, danger, or retribution." A threat of hardship is not included in the list. Therefore, when defense counsel argued that a threat of hardship does not qualify as duress, there was no conflict with the instruction—the instruction reflected, by omission, that hardship was not part of the definition of duress and counsel said that hardship was not part of the definition of duress. As a result, the jury would have had

no reason to disregard that portion of defense counsel's argument. Accordingly, we conclude defendant's right of due process was not violated.

### D. LESSER INCLUDED OFFENSE INSTRUCTIONS

#### 1. *CONTENTION*

Defendant contends the trial court erred by not sua sponte instructing the jury on the lesser included offenses of (1) incest (§ 285) as to both victims, and (2) statutory rape (§ 261.5) as to Daughter. Defendant asserts that under the accusatory pleading test, when taking into account evidence from the preliminary hearing, incest (§ 285) and statutory rape (§ 261.5) were lesser included offenses of rape by duress (§ 261, subd. (a)(2)) because there was evidence that Sister and Daughter consented to intercourse with defendant. Defendant's argument relies upon an expanded view of the accusatory pleading test, set forth in *People v. Ortega* (2015) 240 Cal.App.4th 956.

#### 2. *ACCUSATORY PLEADING TEST*

"Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) Our Supreme Court has explained, "Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036, fn. omitted.)

Nevertheless, in *Ortega*, the Sixth District Court of Appeal utilized testimony from the defendant's preliminary hearing when applying the accusatory pleading test.

26

(*People v. Ortega*, *supra*, 240 Cal.App.4th at p. 967.)  The appellate court explained, "The evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense."  (*Ibid.*)

In *People v. Munoz* (2019) 31 Cal.App.5th 143, the Second District, Division One, Court of Appeal declined to follow *Ortega*.  In *Munoz*, the appellate court remarked that *Ortega* failed to discuss "the many Supreme Court cases . . . stating that the accusatory pleading test looks solely to the language of the pleading itself. [Citation.]  Nor did *Ortega* . . . account for the practical concerns . . . that an expanded accusatory pleading test would lead to inconsistent application and additional burden on the courts."  (*Munoz*, at p. 158.)  The *Munoz* court concluded it was "bound by Supreme Court authority [citation], which makes clear that we are not to look beyond the language of the accusatory pleading itself in assessing lesser included offenses."  (*Ibid.*)

In *People v. Macias* (2018) 26 Cal.App.5th 957, 964, the First District, Division One, Court of Appeal "decline[d] to adopt *Ortega*'s 'expanded accusatory pleading test because it is contrary to *Montoya*,'" which is the Supreme Court case, *ante*, that reflects " '*only* the pleading for the greater offense' " is considered in the accusatory pleading test.  (*Ibid.*)

In *People v. Alvarez* (2019) 32 Cal.App.5th 781, 787, the Fourth District, Division One, Court of Appeal declined to follow *Ortega*.  The *Alvarez* Court cited *Montoya*, *Munoz*, *and Macias* and concluded that it was "required to follow Supreme

27

Court precedent" so it would " 'not . . . look beyond the language of the accusatory pleading itself in assessing lesser included offenses.' " (*Alvarez*, at p. 788.)

We agree that we are bound by the Supreme Court precedent of *Montoya* and are therefore limited to "consider[ing] *only* the pleading for the greater offense" when applying the accusatory pleading test. (*People v. Montoya*, *supra*, 33 Cal.4th at p. 1036, fn. omitted; *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 456.) Moreover, the rule limiting the test to the pleading is particularly necessary in the context of a trial court's sua sponte duty to instruct on lesser included offenses. It is an untenable expectation for a judge presiding over a trial to always independently search through a preliminary hearing transcript searching for lesser included offenses. Accordingly, in applying the accusatory pleading test, we limit our examination to the first amended information.

### 3.    *INCEST*

The law prohibiting incest provides, "Persons being within the degrees of consanguinity within which marriages are declared by law to be incestuous and void, who intermarry with each other, or who being 14 years of age or older, commit fornication or adultery with each other, are punishable by imprisonment in the state prison." (§ 285.)

In the first amended information, Counts 10 through 20 pertained to Sister. Each Count pertained to a different year, from 2004 through 2014. Other than the different years, the charging language in the 11 counts is nearly identical.

28

In Count 20, the People alleged, "For a further and separate cause of action, being a different offense from but connected in its commission with the charge set forth in counts 1 through 19 hereof, the District Attorney of the County of Riverside hereby accuses [defendant] of a violation of Penal Code section 261, subdivision (a), subsection (2), a felony, in that on or about 1/1/2014, through and including 12/31/2014, in the County of Riverside, State of California, the defendant did unlawfully have and accomplish an act of sexual intercourse with a person, to wit, JANE DOE (M.R.), not his/her spouse, against said person's will, by means of force, violence, duress, menace and fear of immediate and unlawful bodily injury on said person and another."

The charges pertaining to Sister do not reflect that defendant and Sister are relatives. Therefore, under the accusatory pleading test, the facts alleged in the first amended information do not include all of the elements of incest.

In the first amended information, Counts 1 through 8 pertain to Daughter. Two offenses were alleged per year from August 2011 through August 2015. So, Counts 1 and 2 pertained to August 18, 2011 through August 17, 2012, and Counts 3 and 4 pertained to August 18, 2012 through August 17, 2013, and so forth. Other than the different years, the charging language in the different Counts is nearly identical.

In Count 8, the People alleged, "For a further and separate cause of action, being a different offense from but connected in its commission with the charge set forth in counts 1 through 7 hereof, the District Attorney of the County of Riverside hereby accuses [defendant] of a violation of Penal Code section 261, subdivision (a), subsection (2), a felony, in that on or about 8/18/2014, through and including 8/17/2015, in the

County of Riverside, State of California, the defendant did unlawfully have and accomplish an act of sexual intercourse with a person, to wit, JANE DOE (N.G.), not his/her spouse, against said person's will, by means of force, violence, duress, menace and fear of immediate and unlawful bodily injury on said person and another. [¶] It is further alleged that the above offense was committed upon a minor who at the time of the offense, was 14 years of age and older within the meaning of Penal Code section 264(c)(2)."

The charges pertaining to Daughter do not reflect that defendant and Daughter are relatives. Therefore, under the accusatory pleading test, the facts alleged in the first amended information do not include all of the elements of incest. Therefore, the trial court did not err by failing to sua sponte instruct the jury on the offense of incest as to either victim.

### 4.    *STATUTORY RAPE*

The law pertaining to statutory rape provides, "Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a "minor" is a person under the age of 18 years and an "adult" is a person who is at least 18 years of age." (§ 261.5, subd. (a).)

In *People v. Wolcott* (1983) 34 Cal.3d 92, our Supreme Court held that enhancement allegations cannot be considered when applying the accusatory pleading test. The court explained that, because a trier of fact must make a finding of guilt prior to making a finding as to any enhancements, the "orderly, step-by-step procedure would

30

become muddled if evidence of the enhancement must be considered in determining guilt of a lesser offense." (*Id.* at p. 101, fn. omitted.) Alternative sentencing scheme allegations are also not considered when applying the accusatory pleading test. (*People v. Woods* (2015) 241 Cal.App.4th 461, 480, 482.)

Section 264, subdivision (c)(2), provides "Any person who commits rape . . . upon a minor who is 14 years of age or older shall be punished by imprisonment in the state prison for 7, 9, or 11 years." Thus, the subsection sets forth an alternate sentencing scheme or alternate penalty provision when a rape victim is a minor who is 14 years of age or older. (*People v. Jones* (2009) 47 Cal.4th 566, 576 [An alternate sentencing scheme is distinct from an enhancement " 'because it does not add an additional term of imprisonment to the base term; instead, it provides for an alternate sentence"].)

Therefore, in terms of the accusatory pleading test, when examining the allegations in the first amended information, we cannot consider the section 264, subdivision (c)(2), alternate sentencing scheme allegation that Daughter was 14 years of age or older. Within the allegations of the substantive rape charges pertaining to Daughter, there is no allegation that Daughter was a minor at the time of the rapes, which means the facts alleged do not set forth all the elements of statutory rape. As a result, the trial court did not err by not sua sponte instructing the jury on statutory rape.

### 5.  *FEDERAL DUE PROCESS*

Defendant contends the trial court's lack of sua sponte instructions on incest and statutory rape violated his federal rights of due process, in particular the rights to present a defense and fundamental fairness. Defendant asserts that a main theory of his

31

defense was consent, so instructions on statutory rape and incest would have been consistent with his defense. Defendant goes on to discuss substantial evidence and his theory that the victims consented to intercourse with defendant.[2]

"Whether a trial court commits error by omitting an instruction on a lesser included offense depends not only on whether the evidence supports the possible commission of an alternative crime, but whether that alternative crime constitutes a 'lesser included offense.' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) Neither incest nor statutory rape are lesser included offenses of rape. As a result, the trial court did not have a sua sponte duty to instruct on either incest or statutory rape. Therefore, we conclude defendant's federal constitutional rights were not violated.

E.    SCHOOL RECORDS

Defendant's trial counsel subpoenaed Daughter's school records. The prosecutor opposed the release of the school records to defense counsel. Defense counsel agreed to have the trial court review the school records in camera. The trial court found no discoverable information and sealed the school records.

Defendant requests this court review the trial court's finding that there is no discoverable information in Daughter's school records. The People assert the records are irrelevant, but do not oppose defendant's request. We have independently reviewed Daughter's school records. The trial court did not abuse its discretion in concluding

---

[2] There is an "instructional distinction between *defenses* and lesser included *offenses*." (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) For the sake of judicial efficiency, we will not delve into the distinction in this case.

there was not discoverable material in the records.  (See *People v. Avila* (2006) 38

Cal.4th 491, 607 [independent review and abuse of discretion standard.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
             J.


We concur:


RAMIREZ
      P. J.


RAPHAEL
      J.